UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MICHELLE HARRIS-KIMBLE, | ) | CASE NO.: 1:09CV2806 |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | GEORGE J. LIMBERT |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | **MEMORANDUM OPINION & ORDER** |
| | ) | |
| Defendant. | ) | |
| | ) | |

Plaintiff requests judicial review of the final decision of the Commissioner of Social Security denying Michelle Harris-Kimble's Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). The Plaintiff asserts that the Administrative Law Judge (ALJ) erred in his June 3, 2009 decision in finding that Plaintiff was not disabled because she retained the residual functional capacity to perform a range of medium work and her past relevant work as a cashier (Tr 16-17, 34-35). The Court finds that substantial evidence supports the ALJ's decision for the following reasons:

I.     **PROCEDURAL HISTORY**

Plaintiff, Michelle Harris-Kimble, filed her application for DIB and SSI on May 7, 2006, alleging she became disabled on March 31, 2005 (Tr. 101-108). Plaintiff's application was denied initially and on reconsideration and thereafter Plaintiff requested a hearing before an ALJ (Tr. 79-82). On March 18, 2009, a hearing was held where Plaintiff appeared with counsel and testified as did Gene Burkhammer, a vocational expert (Tr. 38-46).

On June 3, 2009, the ALJ issued his decision, finding Plaintiff not to be disabled (Tr.9-22). Plaintiff requested a review before the Appeals Council, and the Appeals Council denied Plaintiff's request for review (Tr. 5-8). Therefore, Plaintiff has requested judicial review of the Commissioner's final decision pursuant to 42 U.S.C. Section 405(g) and 1383(c).

## II. STATEMENTS OF FACTS

Plaintiff was born on August 3, 1954, which made her fifty-one years old when she applied for DIB and SSI. Plaintiff graduated from high school in 1981 and has past work experience as a cashier, and as a housekeeper/janitor (Tr. 30, 32).

As of the time of the hearing, Ms. Harris was living with her elderly parents, and helped care for her father. Her adult son and her granddaughter also lived with her (Tr. 29-30).

## III. SUMMARY OF MEDICAL EVIDENCE

In December 2005, during a psychiatric evaluation, Plaintiff reported that she had a diagnosis of carpal tunnel syndrome (Tr. 209). She reported that her last job was as a bus monitor for handicapped children in 2002, which she quit because she "could not deal with" the children anymore, and because the job did not pay enough (Tr. 210).

On February 14, 2006, Brenda J. Smith, M.D., at MetroHealth System, saw Plaintiff as a new patient (Tr. 179-81, duplicated at Tr. 217-19). Plaintiff told Dr. Smith that she had carpal tunnel syndrome in both hands, characterized by numbness, tingling, and burning sensations (Tr. 179). Dr. Smith referred Plaintiff to an orthopedic hand specialist for treatment of carpal tunnel syndrome (Tr. 179). Dr. Smith's objective findings showed that Plaintiff was independent in all of her activities of daily living (Tr. 180-81).

In March 2006, Harry Hoyen, M.D. a hand and orthopedic surgeon, saw Plaintiff for complaints of bilateral carpal tunnel syndrome, mentioning an electromyogram from 2001 (Tr.182). Plaintiff told Dr. Hoyen that she had night splints, which did not help her condition (Tr. 182). Dr. Hoyen found that Plaintiff had atrophy of both thenar eminences, normal sensation of her thumbs, and normal compression and Tinnel's signs bilaterally (tr. 182). Dr. Hoyen recommended a follow-up appointment in six weeks for injections, but Plaintiff did not schedule an appointment (Tr. 182). The record contains no further mention of treatment for carpal tunnel syndrome in 2006.

In January 2007, Aaron Anderson, M.D., an orthopedic surgeon, saw Plaintiff for carpal tunnel syndrome (Tr. 220, duplicated at 230). Plaintiff told Dr. Anderson that she had night splints but did not wear them because they made her condition worse (Tr. 220). Plaintiff complained of left

middle finger triggering at night only, and stated that the numbness had improved (Tr. 220). On examination, Dr. Anderson found that Plaintiff had mild atrophy of both thenar eminences, normal sensation, normal compression testing, and no triggering (Tr. 220). Dr. Anderson noted that Plaintiff's history of carpal tunnel syndrome was based on a remote EMG and occasional popping of Plaintiff's middle fingers, but she had no symptoms at that time (Tr. 220). Dr. Anderson advised Plaintiff that she did not need any acute treatment, and she only needed to return if her symptoms worsened or if her triggering returned (Tr. 220).

In June, 2007, Brian T. Hardy, M.D., an orthopedic specialist, saw Plaintiff for carpal tunnel syndrome and trigger fingers (Tr. 228). Plaintiff told Dr. Hardy that she had painful triggering of her right middle finger and slight triggering of her left thumb, which was not painful (Tr. 228). She told the doctor that her carpal tunnel syndrome had improved (Tr. 228). Plaintiff showed signs of obvious triggering on flexion of her right middle finger, and mild triggering on flexion of her left thumb (Tr. 228). Dr. Hardy injected both of these fingers with kenalog and lidocaine, and her pain improved immediately (Tr. 228). Dr. Hardy instructed Plaintiff to limit motion of those two fingers over the next few days (Tr. 228). Dr. Hardy recommended that Plaintiff return for follow-up treatment in six weeks for re-evaluation (Tr. 228). If she was still triggering, the doctor could attempt another injection (Tr. 228).

In June 2008, Dr. Smith reported that she had not seen Plaintiff since February 14, 2006 (Tr. 309). Dr. Smith made no mention of any symptoms, objective medical findings, or diagnosis related to Plaintiff's hands or carpal tunnel syndrome (Tr. 309-10). According to Dr. Smith, Plaintiff took no medications at all, and denied any weakness (Tr. 309).

In July 2008, Dr. Chingleput Ranganathan saw Plaintiff on referral from Dr. Smith (Tr. 291-92). Dr. Ranganathan reported that Plaintiff had a past illness of carpal tunnel syndrome in both hands, but her central nervous system was normal, her reflexes were normal and her extremities were normal (Tr. 292).

In August 2008, Dr. Smith saw Plaintiff for a follow-up examination, and Plaintiff told the doctor that she had no complaints (Tr. 290). She had tingling in her hand on one occasion (Tr. 290). The doctor did not list carpal tunnel syndrome or trigger finger as one of Plaintiff's active problems

or diagnoses (Tr. 290).

On November 17, 2008, Phuc Nguyen, M.D., an orthopedic specialist, saw Plaintiff for complaints of trigger finger (Tr. 265). Plaintiff told Dr. Nguyen that she had a steroid injection for trigger finger one year earlier in the same finger, and noticed that she had been getting "some catching" of the finger on extension and some tenderness at the base of the third finger (Tr. 265). On examination, Dr. Nguyen noted that Plaintiff had no popping on extension of her fingers, and could make a fist (Tr. 265). Her sensation was intact in the right hand and radial pulse was intact (Tr. 265). Dr. Nguyen gave Plaintiff another steroid injection in her third finger (Tr. 265). Dr. Nguyen also discussed the option of surgery, but Plaintiff told the doctor that she preferred conservative treatment for now (Tr. 265).

On February 23, 2009, Dr. Smith saw Plaintiff for a follow-up appointment, in which Plaintiff complained of problems with her hands after she fell on her right hand (Tr. 257). Plaintiff complained of trigger fingers in her right third finger and left thumb (Tr. 257). She claimed to have difficulty lifting things and writing very well Tr. 257). She had been seeing an orthopedic specialist for these problems, and had bilateral carpal tunnel syndrome, with symptoms on the right worse than the left (Tr. 257). Although Dr. Smith recommended treatment for Plaintiff's other conditions, including prescription of a diuretic for her puffy ankles, Dr. Smith did not mention any treatment recommendations for Plaintiff's hand complaints (Tr. 257).

On February 23, 2009, Dr. Smith completed a medical source statement form regarding Plaintiff's physical capacity (Tr. 255–56). Dr. Smith indicated that Plaintiff was limited to lifting five pounds, due to her orthopedic surgeon's diagnosis of trigger fingers and carpal tunnel syndrome (Tr. 255). Dr. Smith indicated that Plaintiff was limited to walking no more than four hours a day, due to hypertension and shortness of breath, and could sit for unlimited periods (Tr. 255). According to Dr. Smith, Plaintiff could occasionally reach, handle, feel, push, pull, and manipulate, due to "orthopedic findings" (Tr. 256). Dr. Smith stated that Plaintiff was unable to use her hands regularly due to trigger fingers bilaterally and carpal tunnel syndrome (Tr. 256).

On March 24, 2009, Plaintiff underwent an electromyogram of her right and left upper extremities (Tr. 311). Michael Bahntge, M.D., reported that the test showed bilateral median

mononeuropathies at the wrists, consistent with carpal tunnel syndrome that was very severe in degree electrically on the right and moderate-to-severe in degree electrically on the left (Tr. 311). She had mild, chronic, neurogenic changes in two muscles, consistent with cervical radiculopathy at C-8 (Tr. 311).

## IV.     SUMMARY OF TESTIMONY

At the hearing held March 18, 2009, Plaintiff testified that she had quit working as a supermarket cashier in 2002-2003 due to worsening problems with her hands (Tr. 32). She indicated she had been diagnosed with carpal tunnel syndrome ("CTS) at that time, and since then had ongoing problems with CTS off and on. Plaintiff stated that her CTS was at the "top of the list" of her problems; while she also suffered depression, she stated she had been doing "pretty good" with that, and was not on any antidepressant medications at the time of the hearing (Tr. 33, 35). Her hypertension was controlled with medications (Tr. 34).

Plaintiff further testified that she was right-handed, and that her right hand was symptomatically worse than her left hand was (Tr. 33). She experienced numbness, swelling, and pain in her fingers. She had difficulty holding objects, and had trouble opening jars (Tr. 33). Plaintiff found it hard to pick things up, as well as to write. The pain she experienced from the CTS was severe enough to wake her at night. She stated that she utilized two different types of wrist braces, night braces and daytime ones (Tr. 33). She used the daytime braces when she was more active with her hands (Tr. 33-34).

Plaintiff had undergone injections for trigger finger; the last of these, in November of 2008, had relieved that problem at the time of the hearing several months later (Tr. 34). She indicated that she had no difficulty standing or walking, or sitting (Tr. 35); all of her physical limitations involved her hands and arms. Plaintiff stated that sometimes she was unable to lift a gallon of milk, although she was able to lift her handbag (Tr. 34). She was able to drive and did so on a daily basis (Tr. 37), for about 45 minutes.

Plaintiff was addicted to heroin in the past (Tr. 37), but she testified she had been clean since 2004. She was on a methadone maintenance program, which she attended daily, and she would often

also attend group meetings to assist her recovery from drugs (Tr. 35).

Plaintiff testified that she was able to do a little bit" of dusting around her home, as well as some light vacuuming (Tr. 36). She walked and fed the dog (Tr. 36). Her mother did the household laundry (Tr. 36). Plaintiff would, however, change her own sheets.

In caring for her elderly father, Plaintiff would cook for him, and see that he ate (Tr. 35). She would also change his colostomy bag as needed (Tr. 35). Her father was capable of getting up and showering himself, and was able to feed himself (Tr. 30).

Thereafter, Gene Burkhammer, a vocational expert, also appeared and testified as a vocational witness. He characterized Plaintiff's past work as a cashier as being at a light exertional level, and unskilled, with a Specific Vocational Profile ("SVP") of 2, according to the Dictionary of Occupational Titles (Tr. 39). In response to a hypothetical question from the ALJ that asked him to assume a medium exertional capability, with a limitation on handling and fingering to "frequent" (but not constant), a capacity for simple routine tasks, and with only superficial interaction with co-workers, supervisors or the public, the vocational expert opined that Plaintiff could return to her past work as a cashier (Tr. 41-43).

In response to a second hypothetical question from the ALJ, the vocational expert indicated that a further restriction to only occasional handling and fingering eliminated the cashier position (Tr. 42), and would eliminate all other medium-level jobs from the DOT with the single exception of "Laundry Laborer" which had frequent handling but only occasional fingering (Tr. 44).

**V.     STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS**

An ALJ must proceed through the required sequential steps for evaluating entitlement to DIB and SSI. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R. § 404.1509 and

        416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden at step five to show that alternate jobs in the economy are available to the claimant, considering her age, education, past work experience and residual functional capacity. *See, Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## VI. STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Therefore, this Court is limited to determining whether substantial evidence supports the Commissioner's findings and whether the Commissioner applied the correct legal standards. *See*, *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990). The Court cannot reverse the decision of an ALJ, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion. *See, Walters v. Commissioner of Soc. Sec.,* 127 F.3d 525, 528 (6th Cir.1997). Substantial evidence is more than a scintilla of evidence, but less than a preponderance. *See, Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is evidence that a reasonable mind would accept as adequate to support the challenged conclusion. *See, Id.*; *Walters,* 127 F.3d at 532. Substantiality is based upon the record taken as a whole. *See, Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365 (6th Cir. 1984).

**VII.   ANALYSIS**

Plaintiff asserts two assignments of error:

I.   Whether the ALJ's determination of the Plaintiff's residual physical functional capacity is supported by substantial evidence.

II.   Whether the ALJ properly assessed Plaintiff's credibility.

First, Plaintiff does not challenge the ALJ's findings with regard to Plaintiff's mental impairment, but rather focuses on the physical aspects of her disability claim, and in particular, her hand condition, including bilateral carpal tunnel syndrome. Therefore, this Memorandum and Opinion will address only physical conditions of Plaintiff.

During the sequential analysis, the ALJ determined Plaintiff's residual functional capacity. 20 C.F.R. §§ 404.1520(e), 404.1545. Here, the ALJ found that Plaintiff could perform a limited range of medium exertion work that accommodated a limitation for frequent but not constant handling and fingering, as well as a variety of mental limitations (Tr. 17).

Plaintiff concentrated her arguments on the ALJ's decision dealing with his finding that she retained the residual capacity to handle and finger frequently. Plaintiff claims that the ALJ erred in rejecting the opinion of Dr. Smith, her treating physician, who limited her to occasional handling and fingering (Tr. 256). (Pl. Br. at 12-13). Here, the ALJ rejected the opinion of treating physician Dr. Smith, because it was based primarily on Plaintiff's subjective complaints, and was not consistent with the treating physician's objective clinical findings in her treatment notes, or the treatment records from Plaintiff's orthopedic specialists (Tr. 18-19). An ALJ may reject a treating physicians opinion if based upon good reasoning. Wilson vs. Commissioner of Social Security 378 F(3d) 541,546-547 (6th Cir. 2004).

The ALJ cited evidence from Dr. Smith that the doctor had seen her in February 2006 for complaints of carpal tunnel syndrome, but then did not see her or treat her again for this condition (Tr. 18, referring to Dr. Smith's clinical records at (Tr. 179-81, 257, 290, 309-10). At the February 2006 appointment, Dr. Smith diagnosed carpal tunnel syndrome and referred Plaintiff to an orthopedic specialist (Tr. 179), but also noted that Plaintiff was independent in all of her activities of daily living, including activities that would involve a certain amount of manual functioning, such

-8-

as bathing, grooming, feeding, toileting, meal preparation, housework, driving, finances, shopping, and laundry (Tr. 180-81). The next appointment with Dr. Smith did not occur until more than two years later, in June 2008, and at that time, Dr. Smith made no mention of any symptoms, objective medical findings, limitations, or diagnosis related to Plaintiff's hands or carpal tunnel syndrome (Tr. 309-10). Two months later, in August 2008, Dr. Smith noted that Plaintiff had no complaints, and did not list carpal tunnel syndrome or trigger finger as one of Plaintiff's active problems (Tr. 290). In February 2009, Plaintiff complained of hand symptoms to Dr. Smith, but the doctor did not prescribe any treatment for these conditions or make any recommendations for her hand complaints (Tr. 257). Finally, on the assessment form, when asked to describe the medical basis for Plaintiff's hand limitations, Dr. Smith indicated "orthopedic findings" and gave no specific medical findings to support her opinion that Plaintiff could do no more than occasional handling and fingering (Tr. 256). Thus, given Dr. Smith's lack of corroborating clinical findings, the evidence supported the ALJ's stated reason for rejecting the treating medical source's opinion.

In rejecting Dr. Smith's limitations and Plaintiff's disability allegations, the ALJ correctly relied on the findings of the treating orthopedic specialists, who documented Plaintiff's sporadic treatment and lack of acute manual findings during most of the period in question (Tr. 18-19). In March 2006, Dr. Hoyen found Plaintiff had normal sensation in her thumbs, and normal compression and Tinnel's signs (Tr. 182). Ten months later, in January 2007, Dr. Anderson found only mild atrophy, normal sensation, normal compression testing, and no triggering, and no need to return for treatment unless her condition worsened (Tr. 220). In June 2007, Dr. Hardy successfully treated Plaintiff's hand complaints with a steroid injection, reported immediate improvement in her pain complaints, and recommended follow-up in six weeks if she continued to have symptoms (Tr. 228). More than a year later, when Plaintiff saw Dr. Smith and Dr. Ranganathan she made no mention of any hand symptoms, and her hand findings were normal (Tr. 290, 292, 309-10). In November 2008, more than a year since her last steroid injection, Dr. Nguyen reported that Plaintiff had intact sensation, had no popping on extension of her fingers, and could make a fist (Tr. 265). Plaintiff had another steroid injection at that time, and declined the option of surgery (Tr. 265). As the ALJ indicated (Tr. 18-19), these clinical reports and findings from Plaintiff's treating orthopedic

specialists provided a basis for rejecting Dr. Smith's hand limitations. The ALJ's explanations, which relied on the normal examination findings of Dr. Smith and the orthopedic specialists contradicting Dr. Smith's limitations, provided grounds for rejecting Dr. Smith's opinion (Tr. 18-19).

At step two, the regulations require ALJ's to "consider all relevant and available clinical signs and laboratory findings." 20 C.F.R. § 404.1520a(c)(1).

At step three, when reviewing the listings at 20 C.F.R. Pt. 404, Subpt. P., App. 1,"[i]n most instances, the requirements of listed impairments are objective, and whether an individual's impairment manifests these requirements is simply a matter of documentation." SSR 96-5p. The ultimate responsibility for determining the issue of medical equivalence rests with the ALJ. 20 C.F.R. § 404.1525(e).

The ALJ has the responsibility of determining the residual functional capacity based on the evidence as a whole. 42 U.S.C.A. § 423(d)(5)(B); 20 C.F.R. § 404.1546(c). " Under those regulations, the ALJ is charged with the responsibility of evaluating the medical evidence and the claimant's testimony to form an 'assessment of her residual functional capacity." Webb v. Comm'r of Soc. Sec., 368 F. 3d 629, 633 (6th Cir. 2004). The regulations do not require an ALJ to rely on medical opinions to interpret medical records, but explicitly require an ALJ to evaluate medical opinions based on their consistency with and support from "medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1527(d)(2),(3),(4). The ALJ is required, to read medical treatment notes and determine residual functional capacity.

The ALJ does not need a medical opinion to determine residual functional capacity. Ford v. Comm'r of Soc. Sec., 114 F. App'x 194 (6th Cir. 2004); and Poe v. Comm'r of Soc. Sec., 2009 WL 2514058, at *7(6th Cir. Aug. 18, 2009). Hence, there is no need for further medical opinions.

In evaluating Plaintiff's residual functional capacity, the ALJ considered Plaintiff's subjective complaints, but found they were not entirely credible. This Court accords great deference to an ALJ's credibility assessment, particularly because the ALJ has the opportunity to observe the

demeanor of a witness while testifying. Jones v. Comm'r of Soc. Sec., 336 F.3d 469, 476 (6th Cir. 2003). The ALJ stated that he had considered Plaintiff's subjective complaints in accordance with the requirements of Social Security Ruling 96-7p and 20 C.F.R. § 404.1529 (Tr. 17), and set forth the various factors that he had considered in his credibility assessment, including Plaintiff's inconsistent statements about her daily activities, abilities and limitations, and her sporadic treatment (Tr. 17-20). With regard to her manual functioning, Plaintiff's testimony that she was unable to hold things, open jars, pick things up, and write (Tr. 33), contradicted her testimony that her activities included helping her father take his medication and change his colostomy bag, preparing her own meals and those of her father, and performing a myriad of household tasks, such as dusting, feeding and walking the dog, taking out the garbage, cleaning, and vacuuming (Tr. 29-30, 35-36). All of these activities involved fairly significant degrees of manual functioning and contradicted her testimony that she had disabling hand limitations. In addition, with regard to treatment for her hand conditions, Plaintiff went for long periods of time without any treatment for carpal tunnel syndrome or trigger fingers (Tr. 182, 220, 228, 257, 265, 290, 292, 309-10), and when she sought steroid injections, her symptoms resolved immediately (Tr. 228, 265). At her hearing, Plaintiff testified that she no longer had trigger finger symptoms (Tr. 34). These factors supported the ALJ's assessment of Plaintiff's credibility and functioning.

Substantial evidence supports the ALJ's decision that Plaintiff was not disabled. The ALJ correctly rejected the opinion of Dr. Smith because it was unsupported by evidence in the record, and in addition the ALJ correctly found Plaintiff not credible. Substantial evidence supports the ALJ's finding that Plaintiff was limited to frequent handling and fingering.

After considering Plaintiff's residual functional capacity, the ALJ compared her residual functional capacity with the requirements of her past work (Tr. 21). 20 C.F.R. §§ 404.1520(e), 404.1546, 404.1560(b). Since Plaintiff's past job did not require activities in excess of her residual functional capacity, she was found not to be disabled. 20 C.F.R. §§ 404.1520(e), 404.1560(b), 404.1561. Further, Plaintiff must prove that she is unable to return to her past work either as she performed it or as that work is generally performed in the national economy. Studaway v. Sec'y of Health & Human Servs., 815 F.2d 1074, 1076 (6th Cir. 1987).

In this case, the ALJ correctly determined that Plaintiff's limitations did not preclude her from performing her past job as a cashier (Tr. 21), and said finding was supported by the vocational expert's testimony about her past job duties and requirements (Tr. 39). Finally, the vocational expert considered job possibilities for an individual with the same age, education, and work experience as Plaintiff, with hypothetical restrictions for unskilled, medium work that involved simple, routine tasks; superficial interaction with co-workers, supervisors, and the public; no strict time or productions quotas; and frequent handling and fingering (Tr. 40-41). In response to this hypothetical question, the vocational expert testified that such an individual would be able to perform Plaintiff's past job as a cashier (Tr. 41). This testimony from the vocational expert provided substantial evidence for the AJL's step four finding that Plaintiff retained the residual capacity to perform her past relevant work as a cashier, and therefore, was not disabled.

The ALJ credited only those restrictions supported by the record as a whole and rejected those based on Dr. Smith's unsupported opinion. Therefore, the ALJ correctly rejected the vocational expert's testimony that was based on Dr. Smith's unsupported limitations.

Based upon the above analysis, the ALJ correctly relied on the vocational expert's testimony to find Plaintiff was not disabled.

## VIII. CONCLUSION

Based upon a review of the record and law, the undersigned affirms the ALJ's decision. Substantial evidence supports the finding of the ALJ that Plaintiff retained the residual functional capacity (RFC) to perform a range of medium work with certain restrictions and her past relevant work, and therefore, was not disabled. Hence, she is not entitled to DIB and SSI.

DATE: July 20, 2011            */s/George J. Limbert*
GEORGE J. LIMBERT
UNITED STATES MAGISTRATE JUDGE